[Sac. No. 390. Department One.—June 27, 1898.]

THOMAS AMBROSE, Appellant, v. JAMES R. BARRETT et al., Respondents.

MORTGAGE—PAYMENT TO AGENT—SATISFACTION—ATTACHMENT BY MORTGAGOR.
Where at the request of the mortgagors, residing in the state of New York, the note and mortgage when due, and a release of the mortgage, were sent by express, with instructions from the mortgagee to the express agent, at their place of residence, to collect the amount of the mortgage and the expense of collection, and not to give up the papers until the money was paid, the payment to such agent of the required amount of money, and the delivery up of the papers by him, operated as a payment in full to the mortgagee and a satisfaction of the mortgage, notwithstanding the money paid to the agent was immediately thereafter attached at suit of one of the

mortgagors against the mortgagee, and was afterward applied in payment of the demand sued upon.

ID.—ATTEMPTED FORECLOSURE—FINDINGS—PAYMENT—COLLUSION—RIGHT OF ATTACHMENT.—Upon the attempted foreclosure of such mortgage, after payment thereof to the plaintiff's agent, a finding that it was paid and satisfied will not be disturbed upon appeal, upon the alleged ground that the payment and attachment by the mortgagor were collusive and fraudulent, where there is no evidence of such collusion and fraud, and the findings are the other way, and there is nothing in the record to indicate that either the sheriff or the express agent were parties to any trick or fraudulent scheme, nor to show that the mortgagor did not have a cause of action upon which he was entitled to attach the money of the mortgagee.

ID.—PLAN OF MORTGAGOR—NEGLIGENCE OF MORTGAGEE.—If the mortgagor adopted the plan of having the money paid to the mortgagee in the state of New York for the particular purpose of giving the sheriff an opportunity to levy upon it in a contemplated suit by him against the mortgagee, that fact would not constitute fraud and would not operate to set aside and nullify the payment of the money to the mortgagee's agent; and where the mortgagee neglected to pursue the money, or to defend the attachment suit brought against him by the mortgagor, he cannot be relieved in equity.

APPEAL from a judgment of the Superior Court of Madera County and from an order denying a new trial. W. M. Conley, Judge.

The facts are stated in the opinion of the court.

Robert L. Hargrove, and Mullany, Grant & Cushing, for Appellant.

L. L. Cory, for Respondents.

GAROUTTE, J.—This is an action to foreclose a mortgage upon real estate. Barrett and wife, mortgagors, resided in the town of Cazenovia, state of New York. Ambrose, the mortgagee, resided in the city of San Francisco. The note being due and the mortgagors desiring to pay it, Barrett wrote to Ambrose at San Francisco, requesting him to send all the necessary papers by express, C. O. D., with permission to examine them as to their correctness upon their arrival, and stating that if they were correct he would thereupon pay the amount due upon the note. In response Ambrose executed the proper papers and placed them in the possession of Wells, Fargo &

Company, San Francisco, with the following written instructions:

"San Francisco, April 19, 1894.

"Agent at Cazenovia, New York State:

"Please collect from James Russell Barrett twenty-five hundred and sixty-three dollars up to this date, and fifty cents per day from the date of this note until paid, and expense of collection of same, and forwarding same to San Francisco, Cal. And don't give papers up until money is paid; but let him examine papers.                    Thomas Ambrose."

These papers consisted of the note, mortgage and release, and upon their arrival at point of destination Barrett appeared at the express office accompanied by his attorneys, and the agent of the company passed over the papers for examination. Upon examination they were pronounced satisfactory, and thereupon Barrett handed to the agent of the express company the amount due upon the note, with twenty dollars additional, expense of collection. The money was counted by the agent in the presence of all parties, whereupon, finding it correct, the agent took it in his hands and walked toward the safe for the purpose of placing it there for temporary safekeeping. At that moment the sheriff of the county, at the instance and by instruction of Barrett and his attorneys, took the money from the agent of the express company under a levy and attachment upon a purported claim held by Barrett against Ambrose. The evidence in the record is very meagre as to the nature of this claim and the subsequent proceedings had thereon in the state of New York. However, it does appear that this money, less costs, was eventually paid back to Barrett by the sheriff under those proceedings.

Upon the foregoing state of facts the trial court found that the note was paid and the mortgage satisfied, and rendered judgment in favor of defendants. The important question presented upon this appeal is, Was the note paid? Or rather, Should this court disturb a finding of fact to that effect? Putting the proposition here involved in a different form, it is thus presented: At the time the money was taken by the sheriff was it Barrett's money or the money of Ambrose? Or, again, if a robber had taken the money from the agent at the moment

the sheriff took it, as between Barrett and Ambrose, who would suffer the loss? These interrogatories must be answered in line with the finding of fact made by the trial court. At the time the money was taken from the agent he had a complete and perfect possession over it. The papers had been delivered by him to Barrett, and the transaction between them was entirely closed. Everything to be done at that office had been done. It follows that if this agent of the express company was the agent of Ambrose, and acted as such in receiving the money and delivering the papers, then the money was the property of Ambrose when taken by the sheriff. When we examine the written authorization of Ambrose addressed to the agent, heretofore set out, nothing can be plainer than the fact that this agent was acting for Ambrose in the transaction had with Barrett, for by that authorization Ambrose directly instructs him not to give up the papers until the money is paid. That this agent was to receive the money from Barrett for Ambrose is perfectly apparent.

Appellant warmly insists that the whole transaction between Barrett, his attorneys, the sheriff, and the express agent, was collusive, and a gross fraud upon him. There is no evidence of it in the record, and the findings of fact are the other way. Certainly there is nothing to indicate that either the sheriff or the express agent were parties to any trick or fraudulent scheme. As to Barrett himself, it is not disclosed but that he had a perfect legal cause of action against Ambrose. He might have had such a cause of action. The record does not disprove it; and if he had there is no reason in law why he should not attach this money upon a claim based thereon. It may appear inferentially that Barrett adopted the plan of having this money paid to Ambrose in the state of New York for the particular purpose of giving the sheriff an opportunity to levy upon it in the action contemplated by him against Ambrose. And we find nothing in the record indicating any deeper scheme than this. In conceding that to be the fact such concession would not operate to set aside and nullify the payment of the money to the agent of Ambrose. There would be no fraud in the transaction which could possibly compass that result. Looking at the case from all sides, we do not see any great

injustice done to Ambrose by the judgment of the trial court. If Barrett's claim against him was a fraud and a myth, he should have pursued and recovered his money. If Barrett's claim was legal and just the money has been well applied. If the claim was a fraud and a myth, the carelessness of Ambrose in neglecting to stamp its baseness with the seal of the courts of the state of New York leaves him now where equity will not greatly concern herself in securing for him a return of the money.

For the foregoing reasons the judgment and order are affirmed.

Van Fleet, J., and Harrison, J., concurred.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank, and filed the following opinion on the 19th of August, 1898:

BEATTY, C. J.—The principal question involved in this case is a new one in this state, and on that account I desire to state my reasons for dissenting from the order denying a rehearing before the full court. The action is to foreclose a mortgage, and the plaintiff, in addition to the allegations usual in such cases, charges in his complaint that the defendants, who are husband and wife, fraudulently represented that if he would send them the note and a release of the mortgage to the place where they were sojourning in New York they would pay him the amount due; that, relying upon their promise to that effect, he sent them the note and release, but they have never paid the debt, or any part thereof.

The defendants in their answer admit their promise to pay upon surrender of the note and delivery of the release, and allege that they did pay accordingly. The only issue in the case, therefore, was upon the defense of payment. It was found by the superior court that the note had been paid, and that the defendants had practiced no fraud upon the plaintiff in obtaining the release. These findings were attacked by the motion for a new trial, based upon a statement containing all the evi-

dence in the case; and the only question for this court to determine is whether the evidence in the record before us sustains the findings of payment and release.

In regard to the evidence, it may be remarked that it consists mainly of written documents, including the depositions of the defendant Barrett and his witnesses, that it all came in without objection, and that it proves conclusively what the opinion of the court expressly concedes, viz: "That Barrett adopted the plan of having this money paid to Ambrose in the state of New York for the particular purpose of giving the sheriff an opportunity to levy upon it in the action contemplated by him against Ambrose."

It may not be improper to refer to the evidence to show that this concession goes none too far, and that in fact it but faintly portrays the deliberate contrivance by which the defendant Barrett, acting for himself and wife, sought to bring the property of the plaintiff within a foreign jurisdiction, in order that he might be compelled to defend there against a claim which, under the laws of this state and of the United States, he was entitled to have litigated in California.

At the time of the execution of the note and mortgage all the parties were in California. Ambrose had been here many years, and the defendants for three or four years, engaged in various kinds of business. It is not expressly stated that any of them were residents of California, but the facts prove that all were residents here. The note was made payable at a San Francisco bank, and secured by a mortgage of lands in Fresno county. Within a few days after the date of the note and mortgage the defendants went to New York, where they had formerly resided, and from there remitted the interest as it accrued. But when the note was about to fall due, instead of remitting the amount, Barrett wrote first to the San Francisco bank where it was payable, and next to plaintiff, requesting that the note, with a proper release, might be sent by express to New York, with leave to examine, and under a commission to the express company to deliver the papers upon payment of the money. In asking this favor of plaintiff not the slightest hint was given by Barrett that he had any claim against him. On the contrary, the existence of his claim was studiously concealed. In-

deed, concealment was essential to the success of Barrett's scheme, for it cannot be supposed that plaintiff would have voluntarily placed his property within reach of a New York attachment if he had had any reason to suspect Barrett's intention to sue him there, or that he was asserting a claim upon which an attachment might be based.

Plaintiff, then, having no suspicion of Barrett's scheme, fell into the trap which had been laid for him. He sent the note and release by express, to be delivered upon payment of the amount due. The defendant went through the form of paying the money, received the papers, and then immediately took the money back under a writ of attachment issued in a suit which he had taken the precaution to commence in advance in a court of New York.

The question is whether this transaction amounted to payment. The superior court has found that it did, and this court has sustained that conclusion upon grounds which, in my opinion, are untenable.

It seems to be assumed that the whole question is solved when it is determined that the express agent, at the moment of the attachment, held the money as the agent of the plaintiff, and that the case is the same as it would have been if he had been robbed by a third party. But the slightest reflection will show that this is a false analogy. The money was not taken from plaintiff's agent by a third party, but by the party himself who had pretended to pay it. For the writ of attachment was Barrett's own contrivance, and the officer who levied it was his agent. If I pay my debt and my creditor is despoiled by a robber, he, of course, must suffer the loss; but if I hand my creditor the amount due upon a note secured by mortgage, and as soon as I get possession of my note and a release make a forcible recaption of the money, the debt is not paid, nor the lien discharged. And the result is the same whether the creditor is despoiled of all benefit of payment by force or by a fraud deliberately contrived for that purpose. This proposition, I assume, will not be controverted, and I am thus brought to the question upon which the case depends—the question, that is to say, whether Barrett's contrivance was a fraud. Upon that point the opinion of the court is expressed as follows: "It may

appear inferentially that Barrett adopted the plan of having this money paid to Ambrose in the state of New York for the particular purpose of giving the sheriff an opportunity to levy upon it in the action contemplated by him against Ambrose. And we find nothing in the record indicating any deeper scheme than this. In conceding that to be the fact such concession would not operate to set aside and nullify the payment of the money to the agent of Ambrose. There would be no fraud in the transaction which could possibly compass that result. Looking at the case from all sides, we do not see a great injustice done to Ambrose by the judgment of the trial court. If Barrett's claim against him was a fraud and a myth, he should have pursued and recovered his money. If Barrett's claim was legal and just the money has been well applied. If the claim was a fraud and a myth, the carelessness of Ambrose in neglecting to stamp its baseness with the seal of the courts of the state of New York leaves him now where equity will not greatly concern herself in securing for him a return of the money." It is from these views that I wish to express my dissent. There is no right of property more substantial or more meritorious in the eyes of the law than the right of a citizen not to be wrongfully subjected to a foreign jurisdiction in the litigation of claims against him, and the books are full of cases in which it has been held that judgments and other proceedings and orders based upon service of process upon persons or property forcibly or fraudulently brought within reach of the process are voidable for that reason. And these decisions do not rest upon merely technical grounds, but upon substantial reasons which are well illustrated by this case. It is assumed in the extract above quoted from the opinion of this court that the plaintiff is entitled to no consideration, and that equity will not greatly concern herself in his behalf, because he did not go to New York and there contest the merits of Barrett's claim, as if it were a matter of no moment that a citizen of California should be compelled to leave his home and his business and travel some thousands of miles and back to litigate a claim which it was his right to have litigated here. It is safe to say that he would in that case have been subjected to a heavy pecuniary loss, direct and indirect, and, if he could

not legally or justly be compelled to submit to such loss, where is the difference between that and any other fraud?

The case seems to be plain enough on principle, but there is no lack of authority to sustain the view I have indicated. A case very closely in point is *Dunlap v. Cody*, 31 Iowa, 260, which was an action in Iowa upon a judgment obtained in Illinois. The defendant in that case, while residing in Iowa, had been decoyed into Illinois by a false representation that some parties were about to erect a costly elevator there, the site of which he was requested to examine. As soon as he arrived he was served with summons, and the judgment followed. The only difference between that case and this is that there it was the person, while here it was the property which was decoyed into the foreign jurisdiction, and there the fraud was accomplished by the *suggestio falsi*, while here it was only a *suppressio veri*. The decision of the case, however, went upon grounds which cover broadly all frauds upon the jurisdiction. The court in its opinion reviewed the authorities very fully, and as a result of its investigation held that the fraud in obtaining jurisdiction vitiated the judgment, and that it was not incumbent upon the defendant to appear in the foreign jurisdiction to defend, or even for the special purpose of moving for a dismissal of the action. In the course of its opinion the court said:

"Do the means used to obtain jurisdiction of the person of the defendant, in the courts of Illinois, amount to fraud? It would seem that this question scarcely needs discussion. Fraud consists in the *suggestio falsi* or the *suppressio veri*. Both exist here. The false statement was made to defendant by plaintiffs' attorney that Hiatt and others were about to erect an elevator in Hancock county, Illinois, to cost between thirty thousand dollars and forty thousand dollars; and the defendant, being a carpenter, was induced to go to Illinois to look at the site of the proposed structure. The truth—that the object in getting defendant into the state of Illinois was to obtain jurisdiction of his person in an action against him, and avoid the bar of the statute of limitations of the state of Iowa—was suppressed. It cannot be supposed that if the real facts and purpose had been made known to defendant he would voluntarily have gone to Illinois, and

subjected himself to an action upon this demand, long since barred by the statute of limitations of the state in which he resides. Counsel representing plaintiff in this court, and who, it is but justice to say, were not concerned in obtaining the judgment in Illinois, do not seriously controvert the position that the mode of obtaining jurisdiction was fraudulent. They concede that it 'smells somewhat of fraud.' The only palliation which they are able to offer is the suggestion of a doubt whether it may not be considered a 'pious fraud' in which 'the end justifies the means.'

"We do not think that it is entitled even to that small measure of charity.

"An enlightened and just administration of the law, no less than sound public morals, condemns such practices, and demands that the client whose cupidity could sanction, and the attorney whose venality could execute, such a purpose should alike be disgraced. . . . . Now, in view of these authorities, we apprehend it would be admitted that if the plaintiff had seized the defendant and carried him by force to Illinois, and there caused him to be served with a summons, the jurisdiction thereby acquired would be wrongful. Yet the only difference between the case supposed and the one under consideration is that in that case the volition would be overcome by physical force, while in this the will was rendered passive by false and fraudulent suggestions. Had the truth been known to the defendant, he would have been just as unwilling to have gone to Illinois in one case as the other, and we are unable to perceive why the cases should not be followed by similar consequences.

"It is claimed that the defendant should have appeared in pursuance of the summons, and there moved the court to dismiss the proceedings in consequence of the fraud. It may well be doubted whether such appearance, even for the purpose of objecting to the service, would not have placed him within the jurisdiction of the court for all purposes connected with the trial. Such, certainly, would be the effect of such appearance in this state. (Rev. Stats., sec. 2840.) But conceding that he would not be visited with such consequences in the courts of Illinois, and that there the defendant might be relieved from the effects

of an insufficient service, such relief, in this case, could be predicated only upon the fraud of plaintiff in procuring the service. Why drive a defendant to the necessity of traveling, it may be a thousand miles, to put in an appearance at court, and suggest to the court that it has no jurisdiction in consequence of the fraudulent act of plaintiff in procuring service? Under such a construction it would, in many cases, cost more to make defense than to allow judgment to be taken and permit the fraud to triumph."

The principles of this decision are approved in *Durringer v. Moschino,* 93 Ind. 498, and I have not found anything that conflicts with it except in one case in Arkansas. In that case January sued Peel in Arkansas, where he resided, and gave notice that he would take depositions in St. Louis, Missouri. Peel voluntarily went to St. Louis to attend at the taking of the depositions, where he was served with summons in an action commenced there on the same claims. Plaintiffs recovered judgment in the Missouri court, and upon that judgment brought suit in Arkansas, which Peel defended upon the ground that the jurisdiction of the Missouri court had been obtained by fraud. The court held that the jurisdiction had been fraudulently obtained, but disallowed the defense, partly because it had not been properly pleaded, and partly because the defendant had not appeared specially in the St. Louis court and moved to dismiss the action there. They did not hold, however, as is suggested here, that he was bound to defend on the merits in the foreign jurisdiction. On the contrary, they held that he was only bound to appear specially and move to dismiss, because such an appearance would not be a submission to the jurisdiction.

These cases relate to frauds in obtaining jurisdiction of the person, but the same principles apply to questions regarding property. *Ilsley v. Nichols,* 12 Pick. 270, was a suit for damages for breaking outer doors to levy an attachment. It was conceded that the officer was liable for the damages caused by the breaking of the doors, but it was contended that the levy was good nevertheless, and that no damages should be awarded for the goods taken. The court held otherwise, and Chief Justice Shaw, after reviewing the authorities, states his conclusion in these words:

"These cases, therefore, seem to establish the general principle that a valid and lawful act cannot be accomplished by any unlawful means, and whenever such unlawful means are resorted to the law will interpose and afford some suitable remedy, according to the nature of the case, to restore the party injured by these unlawful means to his rights."

This language applies directly to the case in hand. If a sheriff in Massachusetts cannot make a lawful levy on goods otherwise subject to attachment, when he breaks an outer door to get access to them, a sheriff in New York cannot make a valid levy on the property of a citizen of California, in behalf of a citizen of New York, who has by a deliberate fraud procured the property to be brought within that state for the express purpose of having it attached there, and the courts of California could easily interpose and afford a suitable remedy in this case by simply disallowing a plea of payment, founded upon a mere formal transfer of money which was immediately retaken in pursuance of a fraudulent and unlawful design. Instead of affording to our own citizen this entirely suitable remedy, we deny him any relief, and give full effect to a fraud upon our own jurisdiction.

GAROUTTE, J.—Owing to the many live and pressing matters now pending before the court, I have no time to devote to a further consideration of this case. But, in view of the dissenting opinion now filed, and in fairness to the court that denied the petition for a rehearing, I feel compelled to say a few words.

1. Barrett testified that the attachment of the money in New York was based upon an indebtedness of Ambrose to him, upon an express contract. Ambrose testified in detail at the trial, but by no word intimated that such indebtedness did not exist. Hence we assume that it did exist, and therefore the contention of Ambrose in this case is more technical than substantial, as far as any question of justice is concerned.

2. As to the question of fraud practiced by Barrett upon the jurisdiction of the courts of this state, or of New York, or the question of Barrett's fraud in obtaining jurisdiction over the person or the property of Ambrose in New York, matters so largely dwelt upon in the opinion of the chief justice, it is suf-

ficient to say: There is nothing in the pleadings suggesting such a defense; no such question was raised at the trial; the briefs of counsel filed in this court do not intimate it, and the petition for a rehearing does not advert to it. For these reasons it is not a question in the case.

3. The transaction of paying the money at the home of Barrett in New York, through an express company, after an examination of the papers of release by the attorneys of Barrett, was an every-day, ordinary business transaction. And it is only by the barest inference that it can be said Barrett, with the then intent to attach the money, induced Ambrose to send the papers to New York. There is no evidence to that effect in the record, and the trial court substantially found the fact the other way.

4. If the transaction here involved had occurred between these parties at different points in the state of California, I do not believe the judgment of the trial court could have been other than it was; and this case upon the pleadings, the trial, and the argument, stands exactly as though the dealings between the parties had all taken place within the confines of this state.